Harris T. Kille v. Commissioner.
Kille v. Commissioner
Docket No. 11905.
United States Tax Court
1947 Tax Ct. Memo LEXIS 124; 6 T.C.M. (CCH) 896; T.C.M. (RIA) 47217; July 30, 1947
*124 Russell M. Yates, Esq., 605 Lincoln Road Bldg., Miami Beach, Fla., and James A. Taylor, Esq., for the petitioner. F. L. Van Haaften, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1944 in the amount of $7,613.31. The question presented involves the validity of a husband and wife partnership. The return was filed with the collector of internal revenue at Jacksonville, Florida. Findings of Fact Petitioner is an individual residing in Hollywood, Florida. His wife's name is Elizabeth whom he married in 1917. They have five daughters who were born, respectively, in 1917, 1919, 1923, 1927 and 1931. Prior to 1922 petitioner and his wife lived in New Jersey where they operated a truck farm. In 1922 they moved to Florida. In 1926 petitioner started farming in Florida as a sharecropper. In 1929 petitioner began renting farm land and farming it. In 1931 he started a tomato packing house. By 1935 petitioner's farm operations had expanded. He had acquired farm land of his own and the volume of his packing business had increased. Prior to 1935 a broker had *125 taken care of the packing house accounts and records. In and after 1935, due to the increased volume of business, Elizabeth took over these accounts. Her duties in this connection consisted principally of preparing grower's manifests which are checks payable to growers for vegetables delivered to the packing house. These checks have attached to them a list of the vegetables so delivered and the unit price paid. During an average year Elizabeth would make out about 500 such manifests. Elizabeth was born and reared on a farm. She is thoroughly familiar with farming operations in general and tomato raising and selling in particular. She has always helped petitioner with his farm activities. From 1935 to 1944 she handled the growers' manifests, prepared checks for petitioner's signature, advised petitioner with respect to selecting sharecroppers and packing house managers, helped round up packers and emergency help when frost or flood was impending, and kept in touch with sharecroppers' needs from time to time. By 1944 petitioner had 7 sharecroppers. At the time of the hearing there were 23 sharecroppers. In 1938 and until 1944 Elizabeth was paid a salary of approximately $1,000 a year *126 for her services. In January, 1944 petitioner and Elizabeth entered into a partnership agreement. The partnership was styled "Kille Farms" and was formed to engage in farming and packing house operations. The partnership was to pay petitioner $25 an acre per crop year as rental for any of his lands used by the partnership. The partnership was also to pay petitioner $1,200 a year rental on his farm equipment. The agreement recited that petitioner was contributing property to the partnership worth $8,184.92, consisting of cash advanvces for supplies, fertilizer, labor, and so on, and packing house material such as crates and boxes. The agreement further recited that Elizabeth was contributing $8,184.92 in cash. She borrowed $8,000 of this amount from the bank. This debt was evidenced by a demand note to the bank signed by Elizabeth and endorsed by petitioner. The note was secured by some $16,680 worth of securities, of which amount about $5,530 represented stock owned separately by Elizabeth and the remainder was owned by petitioner. It was anticipated that Elizabeth would be able to pay off the note from her distributable share of the partnership profits. As of December 31, 1943, Elizabeth *127 was worth $39,650.22 represented by the following property: cash, $144.47, house and lot $750, 5-acre farm $1,700, United States Government bonds $7,500, residence $24,000, stocks $5,555.75. Half of the government bonds listed above were given to Elizabeth by petitioner in 1942 and the remaining half of such bonds were similarly given to her in 1943. Petitioner gave Elizabeth the residence in 1943. These are the only sizeable gifts from petitioner to Elizabeth. These gifts were not made in anticipation of the partnership agreement. From 1924 to 1930 Elizabeth inherited a total of $4,827.53. Elizabeth maintained her own bank account to which petitioner had no access. The partnership agreement provided that the profits and losses of the business should be shared by petitioner and Elizabeth in the respective proportions of 60 per cent and 40 per cent. The duties of petitioner and Elizabeth were set out in the agreement in the following manner: "8. It is understood and agreed that each partner shall devote full time to the partnership business. First Party [petitioner] to act as general manager of said business and as such shall be responsible for the conduct of the farming and packing *128 house operations. Second Party [Elizabeth] shall keep all books, records, invoices, statements, accounts receivable, accounts payable, tax records and shall be responsible for the management of the financial affairs of the partnership." Both partners were authorized to sign checks for the partnership. One of the reasons for forming the partnership was to accord Elizabeth an authentic business status with respect to the farming operations and to enable her to sign checks and otherwise act officially for the business. Petitioner also wanted to take Elizabeth off the payroll and put her on a profit-sharing basis. Tax saving was also a consideration. The business operated much the same after the partnership as before. The main difference after the partnership was formed was that Elizabeth could and did sign checks. On January 17, 1944, Elizabeth was licensed by local authorities as a "Free Dealer" which had the effect of removing any business disadvantage resulting from her status as a married woman. The partnership books of original entry consisted of a little black vest pocket book which petitioner kept. The partnership agreement was never recorded. During 1944 petitioner withdrew *129 $27,800 and Elizabeth withdrew $18,600 of the partnership funds. On the amount withdrawn by Elizabeth $8,000 was received by her on April 7, 1944, and was deposited in her personal banking account. On the same day she drew a check on her personal account with which she paid off the note. During 1944 Elizabeth paid most of the household expenses which previously had been paid by petitioner. During 1944 the two younger daughters were at home, one daughter was at college and the two elder daughters were married and living apart form their parents. The income as shown on the joint return of petitioner and his wife for the years 1938 to 1941, inclusive, is as follows: Total Net
Income - Kille
Year
Income
Farms Operations
1938
$22,282.51
$21,535.84
1939
31,227.22
29,097.06
1940
23,004.36
19,945.55
1941
2,825.50
( 322.42)
The income as shown on the separate return of petitioner for the years 1942 and 1943 is as follows: Total Net
Income - Kille
Year
Income
Farms Operations
1942
$25,359.00
$24,622.75
1943
52,959.28
50,894.29
Elizabeth's separate returns for 1942 and 1943 reported income in the respective amounts of $1,000 *130 and $1,297.50. The partnership reported net income for 1944 in the amount of $34,402.81, showing the distributable share of petitioner and Elizabeth, respectively, as $20,641.69 and $13,761.12. In reporting his distributive share in his individual return for 1944 under the terms of the partnership agreement, petitioner, through error, overstated his income by $1,059.66, which respondent concedes. Respondent in his deficiency determination added $11,961.12 to petitioner's income for 1944. This amount represents Elizabeth's claimed distributable share of partnership profits in the amount of $13,761.12 minus $1,800 which respondent has allowed as a deduction for reasonable compensation to Elizabeth for her services. Opinion Were Elizabeth and petitioner partners is the question. The facts, in our opinion, present a close case. After careful consideration we have concluded, however, that a valid partnership existed. Respondent stresses certain factors tending to mark the partnership as a sham. Respondent argues that Elizabeth in reality contributed no capital originating with her. The loan was primarily secured by petitioner's stock and his endorsement and was repaid from partnership *131 profits. Furthermore, respondent suggests that petitioner could have more easily borrowed the money himself and did not need his wife for this purpose. Respondent contends that Elizabeth's services to the partnership were not substantially greater than before its formation and that she had formerly been paid $1,000 a year. Respondent further notes that petitioner's income from the farm rose sharply from 1942 to 1943 and that tax saving was admittedly a consideration. We have considered these factors carefully and although they do tend to support respondent's position we think they are outweighed by other considerations. Conceding that the extent, if any, to which Elizabeth may be considered as having contributed capital orginating with her is doubtful, the central fact remains, in our opinion, that Elizabeth was throughly familiar with the business and was able to and did contribute vital services towards its income producing success. She was reared on a farm. She had worked with and helped petitioner during the early years of his farming career. As his activities expanded and the children became older Elizabeth's services increased. She relieved petitioner of much paper work and *132 he relied on her judgment. In a non-technical sense, she was and had been a very real partner for a long time. When in 1944 petitioner's business had grown to considerable proportions the reality of his and Elizabeths' intentions to become partners in a formal sense strikes us as natural and genuine. Her acquisition thereby of an official business and profit-sharing status impresses us as a proper recognition of her services and a legitimate business purpose. The fact that the parties candidly admit that they considered the tax consequences does not, in our opinion, destroy this reality. Our conclusion that petitioner and Elizabeth really and truly intended to become partners is further borne out, we think, by the manner in which the partnership was conducted. Elizabeth's share of profits was not a nominal affair which actually was under the command of her husband as is sometimes the case. She actually received her share and was no more dependent upon petitioner than he was on her for its distribution. The share she received was put in her separate bank account over which petitioner had no control. The fact that she spent some of this money for household expenses is said by respondent *133 to constitute the familiar reallocation of income within the family group. But she was free to spend the money as she wished. She was under no compulsion or obligation to support the household. She did so freely and we think not unnaturally. We do not think she must be required to spend her money in some unusual manner unrelated to her family life to establish the genuineness of the partnership giving rise to the income. For these reasons we have concluded and hold that petitioner and Elizabeth really and truly intended to and, in fact, did join together as partners for the purpose of carrying on a business. It follows that respondent erroneously attributed Elizabeth's share of the partnership income to petitioner. Adjustment will be made under Rule 50 recomputation for petitioner's error in overstating his income by $1,059.66 in his income tax return for the year here involved. Decision will be entered under Rule 50.